TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Acting Chief, Criminal Division
MAXWELL COLL (Cal Bar No. 312651)
Assistant United States Attorney
Deputy Chief, National Security Division
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:  (213) 894-1785
        E-mail:     maxwell.coll@usdoj.gov


Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 2:25-00767-PA |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT MICHAEL DAVID COBERG |
| v. | |
| MICHAEL DAVID COBERG, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California and Assistant United States Attorney Maxwell K. Coll, hereby files its sentencing position for defendant MICHAEL DAVID COBERG.

This sentencing position is based upon the attached memorandum of points and authorities, the declaration of FBI Special Agent Barbara Johnson, the files and records in this case, the United

States Probation and Pretrial Services Office's presentence investigation report, and such further evidence and argument as the Court may permit.

Dated: February 23, 2026

Respectfully submitted,

TODD BLANCHE
Deputy Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Acting Chief, Criminal Division

_____
MAXWELL K. COLL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**Table of Contents**

I.    INTRODUCTION...............................................1

II.   STATEMENT OF FACTS.........................................2

      A.    Background...........................................2

      B.    Defendant Organizes Traffic Stop and Arrest of Victim
            R.C..................................................3

      C.    Defendant Participates in the Extortion of Victim L.A.....7

III.  USPO SENTENCING GUIDELINES CALCULATIONS....................8

      A.    The USPO Correctly Determined that the Six-Level
            Enhancement for Use of Firearm During the Extortion
            Applied.............................................10

IV.   JOINT AND SEVERAL RESTITUTION OBLIGATION..................12

V.    THE GOVERNMENT RECOMMENDS 63 MONTHS' IMPRISONMENT.........12

      A.    The Nature and Circumstances of the Offense.............12

      B.    Need to Afford Adequate Deterrence....................13

VI.   CONCLUSION................................................14

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

As a Los Angeles County Sheriff's Department ("LASD") deputy, defendant MICHAEL DAVID COBERG swore an oath to uphold the Constitution and laws of the United States.  Instead, defendant betrayed that oath and those he swore to protect, abusing the awesome power of his badge. And he did so for an all-too-common reason: greed.

Defendant's betrayal began in 2021 when –- while an active-duty deputy sheriff -- he started working as a close advisor to Adam Iza, a cryptocurrency fraudster who had dubbed himself the "Godfather."  There he conspired with Iza to extort Victim L.A. out of more than $127,000. Victim L.A. never reported the extortion because defendant had a badge. In Victim L.A.'s mind, "the police kidnapped me."  Then, mere weeks before Victim L.A.'s extortion, defendant conspired with Iza, LASD Deputy Christopher Cadman, and another co-conspirator to exact revenge on one of Iza's enemies, Victim R.C.  To do so, defendant worked with Iza and the others to secure drugs inside a car and orchestrate the traffic stop and arrest of Victim R.C.  Defendant did all this and violated his sworn oath for a monthly fee of at least $20,000.

Defendant's conduct is a blight on the integrity of law enforcement.  In view of the seriousness of defendant's conduct, a significant prison sentence is necessary to serve as just punishment, promote respect for the law, and send a strong message of deterrence to all police officers who blur the line between serving the public and working security for private clients.  Accordingly, the government is seeking a sentence of 63 months' imprisonment, followed by a three-year period of supervised, and an order requiring him to pay the $200 special assessment and restitution in the amount of $127,000.

**II.    STATEMENT OF FACTS**

On September 29, 2025, defendant pleaded guilty pursuant to a plea agreement to one count of conspiracy to commit extortion, in violation of 18 U.S.C. § 1951(a), and one count of conspiracy against rights, in violation of 18 U.S.C. § 241.  (Dkt. 8.)  In the plea agreement, defendant agreed to the following facts:

**A.    Background**

At all times relevant to this Factual Basis, defendant, Eric Chase Saavedra ("Saavedra"), Christopher Cadman ("Cadman"), LASD Deputy 4, and LASD Deputy 6 were sworn law enforcement officers employed by the Los Angeles County Sheriff's Department ("LASD").  As LASD deputies, defendant, Saavedra, Cadman, LASD Deputy 4, and LASD Deputy 6 were subject to an oath of duty and rules of conduct.  This oath and these rules prohibited LASD personnel from using their law enforcement status and related equipment for personal use or for non-legitimate law enforcement purposes.

Defendant was a helicopter pilot assigned to LASD's Aero Bureau. As a helicopter pilot, defendant did not have an investigatory assignment nor the duties of a detective.  Defendant did not run confidential human sources.  Defendant was only a pilot observer and a helicopter pilot.  Defendant knew and understood that the Constitution and laws of the United States protect the right to be free from unreasonable searches and seizures and the right to be free from deprivation of property without due process of law by one acting under color of law.

Defendant worked as a private security guard and business partner for Adam Iza ("Iza"), also known as ("aka") "The Godfather,"

2

aka "Ahmed Faiq," aka "Diego," aka "Diego Facebook," aka "Tony Brambilla," aka "Leo," and received cash payments in return for his services.  At the time, Iza was engaged in fraudulent marketing and cryptocurrency schemes.  Defendant received at least $20,000 per month in payments from Iza for his services.

Saavedra owned and operated a company called Saavedra & Associates LLC ("Saavedra & Associates") that provided private security services for clients and often employed active LASD deputies and law enforcement officers.  Private security guards working for Saavedra & Associates accompanied Iza 24 hours per day, seven days a week during which they would often carry firearms and/or brandish their badges while accompanying Iza.  At first, defendant worked one shift for Saavedra & Associates as a private security guard in August 2021.  Soon thereafter, however, defendant obtained his own contract with Iza.  Defendant's personal contract with Iza allowed defendant to work as a business partner and advisor as opposed to a security guard.  Defendant and Iza were planning to start a business selling steroids.

**B.    Defendant Organizes Traffic Stop and Arrest of Victim R.C.**

In August 2021, while working for Iza, defendant learned of a dispute between Iza and Victim R.C., which started because Iza's displeasure with a party that Victim R.C. planned at Iza's mansion in Bel Air in August 2021.  Around the same time, defendant also learned that Iza, Cadman, and LASD Deputy 6 forced Victim R.C. at gunpoint to transfer $25,000 from Victim R.C.'s bank account to a bank account that Iza controlled.

3

After that incident, in September 2021, defendant conspired with Iza and Co-Conspirator 2 to lure Victim R.C. from Miami to Los Angeles to set up Victim R.C. and cause him to be arrested with drugs.  Defendant met with Iza and Co-Conspirator 2 in Iza's office in his Bel Air mansion.  During this meeting, defendant and his co-conspirators discussed a plan where Co-Conspirator 2 would call Victim R.C. and pretend to be interested in pursuing a romantic relationship with Victim R.C.  Co-Conspirator 2 would convince Victim R.C. to fly to Los Angeles to meet with her to use drugs together and have a romantic relationship.  Co-Conspirator 2 would purchase the plane ticket for Victim R.C., pick up Victim R.C. at LAX, drive Victim R.C. to obtain drugs, and then travel to a set location in Los Angeles where an LASD officer would make the traffic stop and arrest. During this meeting in Iza's office, defendant listened to Co-Conspirator 2 speak with Victim R.C. on speakerphone and advised Co-Conspirator 2 about what to say to Victim R.C.  Defendant emphasized the importance of having drugs in Victim R.C.'s possession at the time of the arrest.

On or about September 26 and September 27, 2021, defendant, Iza, and Co-Conspirator 2 executed the plan to arrest Victim R.C. with drugs.  Co-Conspirator 2 picked up Victim R.C. at LAX in her white Telsa vehicle and provided Victim R.C. with cash to purchase drugs. Iza met Co-Conspirator 2 and supplied Co-Conspirator 2 approximately $800 for Victim R.C. to use to purchase illegal drugs.  Co-Conspirator 2 drove to an address in Paramount, California, where defendant organized the traffic stop.  Defendant called Cadman (a deputy at the Lakewood Station), asked him to conduct the traffic

4

stop, and arrest Victim R.C., the victim of the August 2021 incident in which Cadman and LASD Deputy 6 helped Iza force the transfer of $25,000 at gunpoint.  Defendant and Cadman had previously discussed the plan to arrest Victim R.C.  Defendant told Cadman that there were drugs inside the white Tesla.  Cadman informed defendant that Cadman was not working patrol that day but said that LASD Deputy 4 was working patrol and could conduct the traffic stop.

Defendant spoke with LASD Deputy 4 and made several false statements.  Defendant told LASD Deputy 4 that defendant had an ongoing investigation involving a confidential informant who was driving a white Tesla with an individual who had an outstanding warrant for his arrest.  Defendant told LASD Deputy 4 that there was reason to suspect the individual with the warrant had drugs in the car.

At the time defendant made these statements, defendant knew that Co-Conspirator 2 was not a confidential informant, he was not a detective, and he did not run confidential human sources.  While Victim R.C. did have an outstanding warrant for his arrest, defendant did not tell LASD Deputy 4 that (1) the target of the arrest was an adversary of his private client; (2) that defendant was receiving substantial financial payments in exchange for his services, including setting up this arrest; and (3) that defendant had conspired with others to have drugs inside the vehicle at the time of the traffic stop.

On September 27, 2021, LASD Deputy 4 conducted the traffic stop. During the traffic stop, LASD Deputy 4 searched Co-Conspirator 2's vehicle and found a plastic bag containing suspected cocaine under

the front passenger seat, where Victim R.C. had been seated, and two bags containing psilocybin mushrooms inside Victim R.C.'s backpack. Based on the traffic stop and subsequent search of Co-Conspirator 2's vehicle, LASD Deputy 4 caused Victim R.C. to be charged with transportation of a controlled substance, arrested him, and took Victim R.C. to a local jail.

Defendant drove to the scene of the arrest in a black Escalade SUV with Iza in the back passenger seat. Defendant slowly drove past the traffic stop with the window rolled down so that Iza could look at Victim R.C. from the car as Victim R.C. was being arrested. Defendant then drove to a gas station across the street from the traffic stop. From the gas station, defendant and Iza watched the arrest unfold, and Iza took videos and photographs of the arrest.[1]

After the arrest, defendant sent a text message to Cadman thanking Cadman for facilitating the traffic stop and stating that "the kid enjoyed it," which was a reference to Iza. Iza sent photographs and text messages to Victim R.C., including a photograph of Victim R.C.'s arrest in progress, a message stating that "[f]or a drug dealer, you fucked with the wrong people", a photograph of Victim R.C.'s booking photograph, and a message stating "[w]orthless loser. Congrats on the drug felony arrest."

---

[1] Lodged with the Court as Exhibits D and E are two videos that Adam Iza took from the black Escalade during the arrest of Victim R.C.

Exhibit D is a video taken by Adam Iza in which defendant is seen driving the black Escalade. During the video, after law enforcement pulls over the car, defendant states, "That is great."

Exhibit E is a video taken by Adam Iza documenting the arrest of Victim R.C. During the video, Iza states, "Bye-bye, he's going to jail [laughter]." Defendant responds, "He is going to run his mouth . . . this guy won't shut the fuck up."

6

**C.    Defendant Participates in the Extortion of Victim L.A.**

In October 2021, defendant conspired with Iza to extort at least $127,000 from Victim L.A.  Defendant understood that Iza had a financial dispute with an Italian individual Victim L.A. and Victim L.A.'s business partner.  Iza told defendant that Iza had been using a pseudonym to communicate with Victim L.A., and that Victim L.A. planned to travel to Los Angeles to discuss the financial dispute.  Iza told defendant that when Victim L.A. arrived at his Bel Air mansion, Iza would reveal himself as Adam Iza, and defendant should apply pressure to resolve the financial dispute.  Defendant agreed to participate in the conspiracy and took several steps to fulfill the plan.

On or about October 19, 2021, Victim L.A. flew from Florida to California and stayed in a hotel in West Hollywood.  Defendant accompanied other security guards to the West Hollywood hotel in a black Escalade SUV and picked up Victim L.A. from the hotel.  Defendant and the other security guards drove Victim L.A. to Iza's Bel Air mansion.

At the mansion, Victim L.A. was brought into the office.  Defendant and Iza were present inside the office.  Iza placed the handgun on the desk.  Iza also displayed an assault rifle, which was placed on the ground near the desk.  Defendant questioned Victim L.A. about the financial dispute and the location of Victim L.A.'s business partner.  Defendant acted as an investigator and told Victim L.A. that he was an active-duty law enforcement officer.  While defendant was inside the office, Iza demanded that Victim L.A. transfer funds to a bank account that Iza controlled.  While

7

defendant was inside the office, Iza recorded a video of Victim L.A. transferring the entire balance of Victim L.A.'s Bank of America account ($127,000) to a bank account that Iza controlled.  The wire transfer was executed using a server in Richardson, Texas, and thus affected interstate commerce.  Following the wire transfer, while defendant was inside the office, Iza took possession of Victim L.A.'s passport, took a photograph of Victim L.A.'s girlfriend, and directed security guards to drive Victim L.A. back to the hotel.

The following day, Iza's security guards picked up Victim L.A. from the hotel and drove Victim L.A. back to the Bel Air mansion where defendant was present again.  On the second day, defendant was inside the office with Iza and Victim L.A. discussing the financial dispute and the location of Victim L.A.'s business partner. Defendant escorted Victim L.A. and Iza to a shooting range in the basement of the mansion.  Defendant left Iza and Victim L.A. alone in the shooting range.  Inside the shooting range, Iza held Victim L.A. at gunpoint.  Iza recorded two videos of Victim L.A. in the shooting range, including one video in which Iza holds Victim L.A. at gunpoint and another in which Victim L.A. is audibly crying.  Victim L.A. was able to connect with his business partner, who transferred more funds to Iza.  Later that night, after the transfer of funds, defendant drove Victim L.A. back to the hotel in West Hollywood.

**III. USPO SENTENCING GUIDELINES CALCULATIONS**

On January 5, 2026, the United States Probation Office ("USPO") issued the PSR.  The PSR found that the following Guidelines factors applied:

**Count 1**

| | | |
|---|---|---|
| Base Offense Level | 18 | U.S.S.G. § 2B3.2(a) |
| Express/Implied threat of death, bodily injury, or kidnapping | +2 | U.S.S.G. § 2B3.2(b)(1) |
| Loss between $95,000 and $500,000 | +2 | U.S.S.G. § 2B3.2(b)(2), U.S.S.G. § 2B3.1(b)(7) |
| Firearm used to convey specific threat | +6 | U.S.S.G. § 2B3.2(b)(3)(ii) |
| Abuse of position of public trust | +2 | U.S.S.G. § 3B1.3 |
| **Count One Total Offense Level** | **30** | |

**Count 2**

| | | |
|---|---|---|
| Base Offense Level | 12 | U.S.S.G. § 2H1.1(a)(2) |
| Public official and color of law | +6 | U.S.S.G. § 2H1.1(b)(1) |
| **Count Two Total Offense Level** | **18** | |

**Combined Total Offense Level:**

| | | |
|---|---|---|
| Combined Adjusted Offense Level | 30 | U.S.S.G. § 3D1.4 |
| Acceptance of Responsibility | -3 | U.S.S.G. § E1.1 |
| **Combined Total Offense Level** | **27** | |

(PSR ¶¶ 41-80.)  Based on a Criminal History Category of I, and a total offense level of 27, the USPO calculates the applicable Guidelines range as **70 to 87 months.** (PSR ¶¶ 85, 126.)

With the exception of the six-level enhancement for using a firearm to convey a specific threat, the USPO adopted the

9

calculations agreed to by the government and defendant in the plea agreement, which permitted the government and defendant to "argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate."

**A.    The USPO Correctly Determined that the Six-Level Enhancement for Use of Firearm During the Extortion Applied**

As video evidence and witness accounts have indicated, Iza displayed and brandished multiple guns during Victim L.A.'s extortion, which conveyed specific threats of death, bodily injury, or kidnapping before and after the transfer of $127,000.  While defendant did not brandish the firearms himself, he was in Iza's office where at least one firearm was displayed, and it was reasonably foreseeable to defendant that Iza used firearms as a means of intimidation to extract funds.

***First***, in a video taken of Victim L.A. to document the transfer of $127,000 to Iza's bank account, an assault rifle can be seen on the floor of the office.  See Declaration of FBI Special Agent Barbara Johnson, Ex. A.  A redacted screenshot of the video is shown below, with the rifle circled in red:

**Second**, in a video taken of Victim L.A. the next day, after defendant left Iza and Victim L.A. alone in the shooting range, Iza is seen holding the victim at gunpoint.  See Declaration of FBI Special Agent Barbara Johnson, Ex. B.  A redacted screenshot of the video is shown below:

11

As the PSR correctly notes, defendant's prior escort of the victim to the shooting range, combined with his continued participation, demonstrate that it was reasonably foreseeable to him that firearms were being used as a means of intimidation to extract additional funds.  (PSR ¶ 45.)

Because of defendant's early acceptance of responsibility, the government recommends a one-level downward variance under § 3553(a), which would make the total offense level 26.  Because defendant is in Criminal History Category I, his Guidelines sentencing range with the one-level variance is **63 to 78 months' imprisonment.**

## IV.   JOINT AND SEVERAL RESTITUTION OBLIGATION

The government submits that defendant should be held jointly and severally liable with Adam Iza (Case No. 2:24-CR-00630-PA) in the offense conduct for the amount of restitution ordered in this judgement.  The total restitution owed is **$127,000,** to Victim L.A, as agreed to in the Plea Agreement.

## V.   THE GOVERNMENT RECOMMENDS 63 MONTHS' IMPRISONMENT

The government recommends that the defendant be sentenced to a Guidelines term of 63 months' imprisonment, a three-year period of supervised release, a $200 special assessment, and restitution of $127,000.  Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

### A.   The Nature and Circumstances of the Offense

Defendant had served as an LASD deputy for 17 years when he began accepting payments from Iza in exchange for his services.  (PSR ¶ 96.)  Defendant's significant law enforcement experience is aggravating – not mitigating – as it makes his conduct all the more

12

unconscionable and unacceptable.  He cannot claim mistake or that it was a one-off incident.  Just as egregious is the harm defendant's conduct wrought on Victim L.A. and Victim R.C. as well as the profound harm that defendant has caused to the public's trust in law enforcement and in government more broadly.

Our systems confer immense power on law enforcement officers to enforce the rule of law.  Law enforcement officers are duty bound to act within the confines of the law and to use their awesome authority and discretion to uphold the constitutional rights of the people they serve.  So, when an officer like defendant abuses his badge to violate rather than protect those rights, it undermines the confidence and faith that the public must place in these institutions and systems of government.  Here, Victim L.A. thought about reporting the extortion to law enforcement but understood that "the police kidnapped me."  Declaration of FBI Special Agent Barbara Johnson, Exhibit F at 9.  The FBI did not learn about the incident for years because of Victim L.A.'s belief that the police -- the people sworn to protect him -- had kidnapped him at the behest of a fraudster who called himself the "Godfather."  A custodial sentence of 63 months' imprisonment is therefore sufficient but not greater than necessary given the shocking nature and circumstances of the offenses.

**B.    Need to Afford Adequate Deterrence**

As of this filing, defendant is one of four LASD deputies charged with criminal conduct while working for Iza.  See United States v. Eric Chase Saavedra, 2:25-cr-00035-PA; United States v. Christopher Cadman, 25-CR-00583-PA; United States v. David Anthony Rodriguez, 2:25-cr-00486-PA.  The government has also charged Iza and

13

his romantic partner, Iris Au.  See United States v. Adam Iza, 2:24-00630-PA; and United States v. Iris Au, 2:25-cr-00140-PA.  But during the course of this investigation, the government has learned of dozens of LASD deputies working private security for Iza and other clients, including celebrities.  This Court should send a strong message of deterrence to all law enforcement officers who seek to work private security on the side from their sworn duties to protect the public.  Law enforcement must not abuse and use their badges for their private clients.  There should be no blurring of the lines between their awesome authority to fight crime and uphold the constitutional rights of the public, and their efforts to earn additional income from private security clients.

A significant custodial sentence is critical therefore to promote general deterrence. Conversely, an overly lenient sentence would undermine this general deterrence goal.  Law enforcement officers wield considerable power over people's lives and liberties and must exercise that power responsibly, solemnly, and consistent with the law.  At the same time, a meaningful custodial sentence is necessary to send a powerful message to the public that no one, including police officers, is above the law, which may help to restore some of the faith in law enforcement that defendant's conduct has eroded.

**VI.   CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence defendant to 63 months' imprisonment, three years' supervised release, a $200 special assessment, and restitution of $127,000.

14